**[Cite as *Carr v. Carr*, 2021-Ohio-2530.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| COLLEEN CARR (nka MCNAMARA) | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28959 |
| | : | |
| v. | : | Trial Court Case No. 2014-DR-1138 |
| | : | |
| BRIAN P. CARR | : | (Domestic Relations Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of July, 2021.

. . . . . . . . . . .

KEITH R. KEARNEY, Atty. Reg. No. 0003191 & AMY L. BLAIR, Atty. Reg. No. 0073760, 2160 Kettering Tower, 40 North Main Street, Dayton, Ohio 45423
        Attorneys for Plaintiff-Appellee

DEAN E. HINES, Atty. Reg. No. 0062990, 5335 Far Hills Avenue, Suite 313, Dayton, Ohio 45429
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Brian P. Carr appeals from a judgment of the Montgomery County Court of Common Pleas, Domestic Relations Division, which denied his motion to reduce/eliminate spousal support. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} The parties married in 1987. In December 2014, Colleen Carr (nka Colleen McNamara) filed a complaint for divorce. A final judgment and decree of divorce was issued on August 1, 2016. Under the terms of the divorce decree, Brian Carr (Carr) was required to pay spousal support in the amount of $4,000 per month for a period of 112 consecutive months (Tier One spousal support). In addition, Carr was required to pay McNamara a lump sum of $12,000 before December 31 of each calendar year in which he was required to pay Tier One spousal support. During partial years, the $12,000 would be prorated in the amount of $1,000 for each month that Carr was required to pay spousal support. In general, Carr's aggregate annual spousal support obligation was $60,000. The decree specified that Carr's spousal support obligation was based on his "average annual wage and bonus income of $269,000.00 and Wife's average annual income of $80,000.00."

{¶ 3} The trial court retained jurisdiction over the amount of spousal support, but not the duration. The decree provided that spousal support would terminate upon the death of either party or McNamara's remarriage. In addition, the decree ordered that spousal support "shall further be subject to review upon Plaintiff's [McNamara's] cohabitation with an unrelated adult male who contributes to the Plaintiff's income in

accordance with Ohio law."

{¶ 4} In June 2018, Carr moved to modify or terminate spousal support based on his belief that McNamara was cohabitating with her boyfriend, David Boch. In advance of a hearing, Carr sent McNamara a request for admissions, to which McNamara did not reply. In June 2019, Carr filed a motion to deem the requested matters admitted, which the trial court granted. Three months later, in September 2019, Carr withdrew his motion.

{¶ 5} On November 21, 2019, Carr again filed a motion to reduce/eliminate spousal support. The trial court held a hearing on the motion on September 2, 2020, during which both Carr and McNamara testified. On October 26, 2020, the trial court denied Carr's motion, finding that Carr had failed to demonstrate that McNamara was cohabitating with an unrelated adult male who provided support or the existence of a change of circumstances to warrant the modification or termination of spousal support.

{¶ 6} Carr appeals from the trial court's judgment, raising two assignments of error.

## II. Cohabitation

{¶ 7} Carr's first assignment of error claims that the trial court "erred, abused its discretion and ruled against the manifest weight of the evidence in finding that there was no cohabitation of Plaintiff/Appellee with an unrelated adult male who provides support."

{¶ 8} "[C]ohabitation is established, and a spousal support obligation is subject to termination, when a paramour voluntarily undertakes a duty of total support or otherwise assumes obligations equivalent to those arising from a ceremonial marriage." *Raska v. Raska*, 2018-Ohio-3921, 120 N.E.3d 469, ¶ 10 (2d Dist.), citing *Perri v. Perri*, 79 Ohio App.3d 845, 851-852, 608 N.E.2d 790 (2d Dist.1992); *Rihan v. Rihan*, 2d Dist. Greene

No. 2005-CA-103, 2006-Ohio-2671, ¶ 11. We have recognized that a primary purpose of a cohabitation provision is " 'to prevent a person from receiving support from two sources, each of whom is obligated or voluntarily undertakes the duty of total support.' " *Perri* at 850, quoting *Taylor v. Taylor*, 11 Ohio App.3d 279, 280, 465 N.E.2d 476 (1st Dist.1983). "Cohabitation is a question of fact for the trier of facts." *Raska* at ¶ 10.

{¶ 9} On occasion, this appellate district has continued to state that a trial court's decision should not be reversed as against the manifest weight of the evidence if it is supported by some competent credible evidence going to the essential elements of the issue. *See, e.g., Raska* at ¶ 9, citing *Day v. Day*, 2d Dist. Greene No. 2002-CA-79, 2002-Ohio-6779, ¶ 4. However, the manifest-weight standard requires us to weigh the evidence and all reasonable inferences, to consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19; *Bass v. Bass*, 2d Dist. Montgomery No. 28217, 2019-Ohio-2746, ¶ 35; *Winhoven v. Winhoven*, 2d Dist. Clark No. 2014-CA-137, 2015-Ohio-2793, ¶ 16.

{¶ 10} According to her testimony at the September 2, 2020 hearing, McNamara began dating Boch in 2015, after the complaint for divorce was filed but prior to the filing of the judgment and decree of divorce. She resided at the marital residence while the divorce case was pending. The terms of the divorce decree, which was filed on August 1, 2016, required to her to vacate the marital residence by August 22, 2016. McNamara looked for an apartment, and on August 2, she signed a one-year lease for an apartment on Far Hills Avenue, located in the Georgetown of Kettering apartment complex in

Kettering. McNamara moved into that apartment around August 22, 2016. After the one-year written lease expired, McNamara rented the apartment on a month-to-month basis. McNamara initially paid $675 per month in base rent. Beginning September 2018, the base rent increased to $750 per month. The resident ledger for her apartment (Exhibit C) showed that McNamara paid additional fees for pest control, trash removal, and water/sewer. McNamara testified that she also paid for electricity for the apartment.

{¶ 11} McNamara testified that she resided at the apartment until the weekend before the hearing. She had purchased a house on Indian Hills Drive in Kettering on Friday, August 28, 2020, and moved in the next day. McNamara explained that she had not previously purchased a home, because she and Carr had a second home that was in foreclosure and she needed to wait three years for credit purposes. McNamara paid a 20 percent down payment from her savings for the Indian Hills home, and all the expenses for the residence (mortgage, utilities, cable, real estate taxes) were in her name. The deed was in her name only, and she intended to live at the home alone.

{¶ 12} Carr presented numerous documents that listed McNamara's home address, beginning immediately after the filing of the divorce decree, as a residence on West Woodbury Drive in Harrison Township, which McNamara agreed was the home of David Boch, her boyfriend. These documents spanned nearly every important aspect of McNamara's life, including her passport, driver's license, bank statements, credit union membership card, credit card statements, Verizon bill, car loan documents, tax returns (federal, state, and local), checks, vehicle registrations with the Ohio Bureau of Motor Vehicles, Ohio voter registration, realtor license, and court cases in Springboro. Carr also presented evidence that McNamara had 76 Amazon purchases delivered to the

Woodbury address. McNamara acknowledged that she had no Amazon purchases delivered to her Far Hills apartment. In addition, McNamara's PayPal account listed the Woodbury address as her address.

{¶ 13} McNamara provided three reasons why she listed the Woodbury address, rather than her Far Hills apartment, as her address. She first stated that, prior to the filing of the divorce decree, Carr was "taking things and hiding them on me," and she had concerns about not receiving her passport for a destination wedding in August 2016. McNamara stated that she had her passport sent to the Woodbury address and that she "had to match my [driver's] license to my passport." Second, she repeatedly expressed that, as a realtor, she had concerns about clients' researching her on the internet and discovering that she lived at an apartment. Third, McNamara stated that she had problems with mail delivery at the Far Hills apartment. Specifically, packages were incorrectly delivered to a different apartment, and mail would get soaked when it rained. McNamara testified at the hearing that she planned to change her address to the Indian Hills address.

{¶ 14} When questioned about whether her and Carr's three adult children had been to the Far Hills apartment, McNamara indicated that only one child, who lived in Columbus, had been to the apartment. She stated that all three of her children had been to Boch's home for Christmas holidays, explaining that his home was larger and the gathering included his children, as well. Boch had been to McNamara's apartment, but she testified that he never stayed there before Covid and had only stayed there "maybe once a week" since.

{¶ 15} McNamara repeatedly denied that she lived at the Woodbury address and

cohabitated with Boch. She asserted that, from August 2016 until she closed on the Indian Hills home, she resided alone at the Far Hills apartment. McNamara testified that she stayed overnight at Boch's home two or three times a week, at most, and no more than two consecutive nights. McNamara asserted that she received no financial assistance from Boch, and she paid his cable bill in exchange for his storage of her vehicle, treadmill, and elliptical machine. McNamara stated that the divorce decree precluded her from receiving any financial assistance from Boch, and it "requires me to have my own residence so at this point I was renting." She did not have any joint bank, credit, or investment accounts with Boch, and she testified that she received no money from Boch and that he paid no debts on her behalf. McNamara further stated that she did not contribute to Boch's mortgage, heating bill, water and sewage bills, or other expenses.

{¶ 16} Carr testified that he sought a reduction in his spousal support obligation based on statements from his children about the amount of time that McNamara was spending at Boch's residence. Carr knew that McNamara had been dating Boch before the divorce, and an email exchange between McNamara and Carr suggested to Carr that she was maintaining her apartment solely for the purpose of maintaining her spousal support, not to live there. Carr stated that he thought "it's a sham that she's spent thousands of dollars a year to cheat me out of money."

{¶ 17} Carr, an accountant, testified that he reviewed "all of the records in this case." He did not see any income from Boch to McNamara's bank account, although he indicated that he did not expect to find any evidence there. Carr acknowledged that he did not see any joint credit card statements for Boch and McNamara, nor any indication

that Boch helped sign or pay for her leased apartment or paid living expenses or debts on McNamara's behalf. Carr stated that he had no evidence that anyone other than McNamara paid her bills. Carr hired a private investigator to watch the house and the apartment, but he did not offer any witnesses regarding that investigation.

{¶ 18} Upon consideration of the evidence, the trial court found that Carr had failed to demonstrate that McNamara was cohabitating with Boch. It reasoned:

Although the court finds [McNamara's] testimony to be somewhat testing the limits of credibility when explaining why she lists [Boch's] residence on virtually every document, including, but not limited to cell phone bills, passport, driver's license, bank statements, etc. [sic] However, there was no evidence submitted that actually demonstrated that [Boch] and [McNamara] are residing together. Even more, there was no demonstration that the parties have engaged in a relationship that is tantamount to a ceremonial marriage. In fact, there was no evidence submitted that the parties are sharing living expenses.

There was no evidence that either [McNamara] was supporting [Boch], nor [sic] that [Boch] was supporting [McNamara].

{¶ 19} Upon review of the record, we cannot conclude that the trial court's determination that McNamara and Boch were not cohabitating was against the manifest weight of the evidence. In reaching its determination, the trial court, as the trier of fact, was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *See State v. Hemming*, 2d Dist. Montgomery No. 28738, 2021-Ohio-971, ¶ 37. Moreover, it was the province of the trier

of fact to weigh the evidence and determine whether Carr had met his burden to demonstrate cohabitation.

{¶ 20} Here, McNamara testified that she rented and resided at an apartment on Far Hills Avenue from August 2016 until late August 2020. The resident ledger substantiated her claim that she maintained that apartment. McNamara repeatedly denied that she resided with Boch at his Woodbury home. She indicated that she stayed overnight at Boch's residence two or three nights per week, at most, and Boch infrequently stayed with her at her apartment. Carr did not present any evidence to refute her testimony in that regard.

{¶ 21} There was no evidence that Boch paid any of McNamara's debts, had any joint finances with her, or provided any financial support for McNamara. McNamara's testimony reasonably reflected that she was scrupulous in her efforts to ensure that Boch did not provide her with any financial support. For example, she indicated that, because she was not permitted to receive any support from Boch, she paid his cable bill to compensate him for storing her vehicle and workout equipment. In light of this evidence, the trial court reasonably concluded that Carr failed to establish that McNamara cohabitated with an unrelated adult male who provided support.

{¶ 22} Carr focuses on the numerous documents showing that McNamara identified Boch's residence as her home address, beginning from the time of the divorce. The trial court questioned McNamara's credibility as to her explanations for doing so, and it would not have been unreasonable for the trial court to reject McNamara's explanations and conclude that she used Boch's address because she, in fact, resided with him. However, Carr did not present evidence to refute McNamara's testimony regarding the

amount of time that she stayed at Boch's home, and he provided no evidence that Boch provided any support for McNamara. Accordingly, we cannot conclude that the court lost its way in finding that Carr's evidence did not establish cohabitation with an unrelated adult male who provides support.

{¶ 23} Carr's first assignment of error is overruled.

### III. Change of Circumstances

{¶ 24} In his second assignment of error, Carr claims that the trial court "erred, abused its discretion and ruled against the manifest weight of the evidence" by failing to consider (1) a change of circumstances not contemplated at the time that the decree of divorce was filed and (2) the factors for modifying spousal support as detailed in R.C. 3105.18(C) and R.C. 3105.18(F).

{¶ 25} Before a trial court may modify a spousal support award, the trial court must determine that the divorce decree contained a provision specifically authorizing the court to modify the amount or terms of spousal support and that the circumstances of either party have changed. *Ford v. Ford*, 2d Dist. Montgomery No. 28358, 2019-Ohio-3920, ¶ 11, citing *Strain v. Strain*, 12th Dist. Warren No. CA2005-01-008, 2005-Ohio-6035, ¶ 11; R.C. 3105.18(E).

{¶ 26} A change of circumstances "includes, but is not limited to, any increase or involuntary decrease in the party's wages, salary, bonuses, living expenses, or medical expenses, or other changed circumstances so long as * * * (a) [t]he change in circumstances is substantial and makes the existing award no longer reasonable and appropriate [and] (b) [t]he change in circumstances was not taken into account by the parties or the court as a basis for the existing award when it was established or last

modified * * *."  R.C. 3105.18(F)(1); *Stevens v. Stevens*, 2d Dist. Montgomery No. 27761, 2018-Ohio-2662, ¶ 7.

{¶ 27} Even when the evidence does not establish a finding of cohabitation, a trial court may consider whether the relationship between the spousal support obligee and the paramour resulted in a change of circumstances sufficient to entitle the spousal support obligor to some relief.  *Perri* at 852.  "Simply put, the focus should be on whether an appreciable amount of the spousal support paid by the obligor directly benefitted the paramour.  If so, the proper remedy is not the termination of spousal support, but a reduction in the amount of support to the extent that it directly benefitted the paramour." (Citations omitted.) *Raska* at ¶ 12.

{¶ 28} If the trial court finds that a change of circumstances exists, it must then determine whether the change of circumstances merits a termination or modification of the existing spousal support order.  *McNutt v. McNutt*, 2d Dist. Montgomery No. 20752, 2005-Ohio-3752, ¶ 10.  "In order to make that determination, a trial court must consider all relevant factors, including those listed in R.C. 3105.18."  *Norbut v. Norbut*, 2d Dist. Greene 2004-CA-87, 2006-Ohio-2130, ¶ 30; *Ford,* 2d Dist. Montgomery No. 28358, 2019-Ohio-3920, at ¶ 12.  R.C. 3105.18(C)(1) enumerates the following factors that the trial court must consider in determining whether spousal support is "appropriate and reasonable" and "the nature, amount, and terms of payment, and duration of spousal support":

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and

equitable.

"The burden of showing that a reduction of spousal support is warranted is on the party who seeks the reduction." *Bohme v. Bohme*, 2d Dist. Montgomery No. 27258, 2017-Ohio-1190, ¶ 9, quoting *Reveal v. Reveal*, 154 Ohio App.3d 758, 2003-Ohio-5335, 798 N.E.2d 1132, ¶ 14 (2d Dist.).

{¶ 29} We review a trial court's decision regarding modification of spousal support for an abuse of discretion. *Ford* at ¶ 11. An abuse of discretion occurs when a court's attitude is unreasonable, arbitrary, or unconscionable. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 30} The parties' divorce decree stated that the amount of spousal support was based on Carr's average annual wage and bonus income of $269,000 and McNamara's average annual income of $80,000. Carr testified that the $269,000 amount was based on a three-year average.

{¶ 31} At the beginning of the September 2, 2020 hearing, the parties stipulated that Carr's current average income from his employment was $405,000 and that McNamara's average income from her realty business remained $80,000. The record reflects that neither party had a change of employment. Carr continued to work at his accounting and financial services firm and McNamara continued to work as a realtor for Coldwell Banker.

{¶ 32} Carr did not demonstrate that McNamara had a significant change to her expenses or that Boch was contributing, in any way, to the payment of her expenses. Nor did Carr provide any evidence that McNamara was supporting Boch in any way.

Other than his assertion that McNamara was maintaining her Far Hills apartment as a "sham" and that she was living with Boch, Carr did not offer any basis for a change of circumstances.

{¶ 33} The trial court expressly found that Carr had "failed to demonstrate a change of circumstances that warrant a modification and/or termination of the spousal support[.]" On this record, the trial court did not abuse its discretion in finding that Carr failed to demonstrate the existence of a change of circumstances. There was no evidence that an "appreciable amount of the spousal support paid by the obligor directly benefitted the paramour."

{¶ 34} Carr further claims that the trial court erred in failing to consider the statutory factors in R.C. 3105.18. However, given that the trial court concluded that there had not been a change of circumstances, the trial court was not required to consider whether the statutory factors supported a modification in spousal support. *See Ford* at ¶ 16 ("*Norbut* stands for the proposition that, when there has been a change in circumstances that could support a spousal support modification, the court, before ordering such modification, must consider the R.C. 3105.18(C) factors.).

{¶ 35} Carr's second assignment of error is overruled.

### IV. Conclusion

{¶ 36} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P. J. and WELBAUM, J., concur.

Copies sent to:

Keith R. Kearney
Amy L. Blair
Dean E. Hines
Hon. Timothy D. Wood